Kenneth Mauer v. Pension Committee of the National, et al. Good morning and may it please the court, my name is Myron Rumeld of the Proscar Firm for Appellate Pension Committee of the National Basketball Association Referees Pension Plan. In ruling that Kenneth Mauer was entitled to immediate receipt of a lump sum pension, the district court usurped what should have been the preeminent role of the NBA Pension Plan's administrative committee in interpreting the relevant plan provisions. The district court readily acknowledged that in the ordinary course, where a plan bestows on its administrative committee the discretion to interpret the plan document, the administrative committee's interpretation of ambiguous plan terms should be overturned only if they are found to be arbitrary. What is the ambiguous term? Termination of employment, in this case, Your Honor. Termination does not mean termination. Termination, as we explained in our papers, could have two meanings. Termination of employment without any regard to the employee's possible return to work, and termination of employment taking into account whether there was a reasonable possibility that the referee could return to work. And in this case, because of the very unusual circumstances associated with the fact that Mr. Mauer had another lawsuit going on in which he directly challenged his termination of employment, the committee determined, first of all, that it was appropriate to interpret the plan to take into account the prospects of a return to work. And in this case, those prospects were not unreasonable. So, and just to be clear, no one was disputing that Mr. Mauer is entitled to a pension. It was only a question of when he's entitled to a pension. I just, on this question of termination being ambiguous, it's not enough to be able to come up with an alternative explanation for what a term means. On the face of it, and in the context of this plan, how is it that termination is ambiguous? I guess I'm still stuck on that. Well, first of all, it's a pension plan. Pensions are paid to people who have ceased working. So, if we had awarded Mr. Mauer a lump sum, so we couldn't get any of it back, and he had returned to work, we would effectively have paid a pension to a person who was not retired. Right, but it's, it is clear that the plan contemplates that people can return to work, correct? It does contemplate that people return to work, and as we explained in our paper, those provisions don't refer to whether those employees already received a pension, and we do not rule out the possibility that a pension might be awarded to a referee, because at the time there were no reasonable prospects of his returning, but something unexpected happened. Just to be clear, we did not intend to state that there had to be a metaphysical certainty that a referee would not return to work. This is why we felt the district court misconstrued what our interpretation of the plan was. Right, you're not arguing for metaphysical certainty, but this idea that termination has qualifiers. Termination might mean that, you know, if we think you're not going to come back in six months, or we think you're going to win your law, I mean, you are putting qualifications on termination that are not in the plan, that are not suggested on the whole from a reading of the plan, that are not dictionary-based. You're putting this qualification on termination that I don't understand the basis for. Well, for purposes of determining whether there's an ambiguity, it's sufficient that the committee proffer two reasonable interpretations, and the fact that the word termination of employment, which is not defined in the plan, the plan has a definitions section, which I believe defines 34 different terms, but this term is not defined in the plan as the court acknowledged, and that already creates a certain ambiguity, but there are all sorts of circumstances. So any time a term in a plan is not defined, we should deem it ambiguous? It's certainly the starting point for a discussion, and in this case, your honor mentioned the contextual reading of the plan, and the mere fact that termination of employment doesn't explicitly have that additional qualifier doesn't take into account the fact that in the context of a pension plan, where somebody is challenging the termination of his employment, it's not unreasonable to construe termination of employment to mean, hey, we have to consider whether the person is really terminated. But the person is really terminated. You're dealing with predictions as to what may happen in the future to alter his status. And sometimes pension plan committees have to exercise judgment, the judgment that should be left with the committee, not this court, as to whether it's that the referee might return. Just to give one obvious example, there's another referee who has a lawsuit challenging his termination, and he very explicitly is demanding reinstatement. So is it appropriate to award that person a pension when the court may rule next month that he should be reinstated, and in the meantime, we've paid him a lump sum pension benefit? So there is context here, Your Honor. That's precisely the point. And the question for this court is, should that contextual explanation be performed by the committee or should be performed by the court? I would submit that even though the court, the district court said it was finding that the term was unambiguous, what the court really did is it provided various reasons why it felt that this interpretation was the preferred interpretation. But I don't think the court ruled out the prospects of the other interpretation being reasonable. And if there are two reasonable interpretations, then it's for the committee to decide in the first instance and for the court to be restricted by the arbitrary and capricious standard of review. Can I just ask you, so under your definition of termination of employment, how would the committee even go about just hypothetically determining whether or not there is a reasonable possibility of return? I mean, you could, aside from death, what would be something to assure you that there's no reasonable possibility of return? Well, so, you know, we discussed that at the end of our brief, that in the ordinary course, when a referee retires or certainly when a referee is terminated, you would not think he's going to return and he would get his pension. This was not the usual case because the referee challenged his termination by filing a lawsuit. So it's never a permanent termination if the terminated referee is filing a lawsuit. So in that, it's that category of scenario where it's not a real termination. Is that your view? Well, I, for purposes of explaining what happened here, that was the view of the committee. But I would submit, Your Honor, that once you go down the path of trying to say what happens in this circumstance and what happens in that circumstance, I think Your Honor is explaining why it is that there is some ambiguity here and why it is that it's appropriate to leave it to the committee because relative to us, it's the committee that has the best understanding of the circumstances under which referees come and go and might retire and might come back to work and whether it's appropriate to reach the conclusion that a referee has some reasonable prospects of returning. So this was one example, but I certainly wouldn't suggest that in the ordinary course, a referee who retires would get his pension when he submits an application for it. This was an unusual circumstance, but we do think it's appropriate to construe the plan not in this very hard and fast way that if the referee separates, that's the end of the discussion altogether. Okay, Mr. and I'm sorry, was it Rumeld? Rumeld, you've reserved two minutes for rebuttal. Okay, thank you, Your Honor. All right, thank you. May it please the Court, Sheldon Karasik for the Plaintiff Appellee. I'd like to address the points that my adversary made in response to the Court's questions and focus my argument on that. First question, I think, was how is the plan ambiguous? The plan and the law requires that it be construed in the context of the entire document. There is not one provision in a 100-page plan that begins to qualify the term termination in any regard. It does not add that special language that counsel would like added, meaning that there's reasonable prospect of reemployment. That appears nowhere, and in fact, the plan is drafted so that irrespective of what happens to a terminated employee, that employee can be reinstated and can be reinstated after receiving his entire pension benefit. And I call the Court's attention specifically to provision of the plan, which is section 4.1 parens, small s, and parens. If a former referee who had received payment of his entire benefit under the plan again becomes employed as a referee, he's terminated, he receives his entire benefit, and then he's reemployed as a referee. Those same provisions appear throughout the plan. Another example, 4.1a, small m, parens, 1, and parens. If a former referee who had received payment of his entire benefit under the plan again becomes employed as a referee, the point is termination is discussed throughout the plan, especially in the context of what happens with reinstatement. There's a protocol set forth for receiving your benefits. Somebody is terminated, they receive their benefits, and they can be rehired. That's something improper in awarding a lump sum payment to a referee who didn't retire. Now, that was an acute use of language because we're not talking about retirement, we're talking about termination. And what he was suggesting without specifying is that there are some limitations under the IRS for tax qualified plans if you pay somebody a pension and he didn't really retire. And one of the cases they cited is the Arasage case, the Second Circuit case, which involved somebody who had worked for a trade union, and then he took early retirement, and then he got another job that counts for the trade council. And the court held that that would be improper because if you're paying out money to somebody who didn't really retire, your tax qualified status is in jeopardy. There is nothing like that, nothing like that in the plan, in the law with respect to paying out somebody who's been terminated his entire benefit. And the plan specifies that's what happens. He's terminated, he gets his entire benefit, and he's rehired. That is in the plan itself. In addition, we're talking about construing the plan as a whole. They can't, just because a term is undefined, it's therefore ambiguous as the court was suggesting, there are many, many terms in a 100-page plan. Is it the obligation of the Pension Committee to define those terms? It's an absurdity. Can I just ask you, with regard to the argument that you didn't challenge, or did you challenge the interpretation of termination of employment in the initial proceedings? The law is clear, Your Honor. Under ERISA, we only have to assert all claims in the administrative proceeding. Issue exhaustion is not required. Issue exhaustion is not required under ERISA. That is the law across the country. The Gannon case, which we cite in our papers, the Third Circuit, the Ninth Circuit, the Tenth Circuit, all say the same thing. Issue exhaustion is not required. Excuse me, Your Honor? What does the Fifth Circuit say? I'm not sure. I think the Fifth Circuit may be different, but we're not in the Fifth Circuit, Your Honor. We're in the Second Circuit. I'm grateful for that answer. Do you know what the Second Circuit itself held, Your Honor? In the Kirkendale v. Halliburton case, this Court held that a plaintiff who did not even follow a claim procedure under ERISA to even file a proper claim was not precluded from suing in court. So not only in the Second Circuit is issue exhaustion not required, but any kind of exhaustion apparently is required. But the law is clear. It's claim exhaustion. And we certainly did our claim exhaustion by appealing their denial. In addition, what is the standard? I mean, they wrote back and said, well, there's not certainty that you quit. I mean, that's an absurd argument, as Your Honor was pointing out. There's never certainty. Life contains all sorts of uncertainties. Many, many people are contemplated under this plan as being reliable. There's always an uncertainty. How can you get that level of certainty? In fact, consider this. Mr. Mauer, indeed, did file a lawsuit. So that lawsuit is filed in 2022. It's still going on. We still even we haven't had yet a post-discovery conference. It is 2025. So let's say this case goes to trial in 2026. Whoever loses is going to appeal. So where are we now? We're 2028. So what's going to happen at the end of 2028? There's going to be a decision. That decision will not be that Mr. Mauer was terminated or wasn't terminated. So what are we waiting for? That decision will be the following. He was terminated lawfully or unlawfully. So what is, we're waiting for Godot here. What is going to happen? There's never going to be a decision on whether he was terminated because it's obvious to the whole world. It's like the king's not wearing clothes. It's obvious to the whole world he was terminated. Now, he may be rehired, highly unlikely since he waived that, but there's no question he was terminated and there was no question in their plan that that termination in many situations, as the plan says in the provisions I quoted, can result and will result, in fact, will result in the payment of the pension. That's how it works. So Mr. Mauer, my client, terminated in 2022. I don't know, 2028, we finally have a decision. Then he's terminated. Then he's terminated. Then he gets his benefit. The only problem with that scenario is that it's not going to be a pension benefit in many cases, if we apply this. It's going to be a death benefit because we don't know how long we'd have to wait. I mean, you have statutes of limitations, say for breach of contract to go up to 10 years, Iowa, Indiana, Wyoming, Louisiana. So what do we do under this scenario? Let's wait for the statute of limitations to run. Oh, okay, at the end of 10 years, somebody filed a suit. Gee, they just filed a suit against the NBA. Wow, we better wait to see if that ends. Well, that's another three to five years, trial, appeal. So now we're waiting 15 years and then what happens? They're terminated? No, they're not terminated. There's a decision whether the termination was proper or improper. They were terminated the day they got a termination letter. And in the case of my client, if anybody who was terminated will not be reinstated, trust me, it's my client. He waived it. He waived it in his lawsuit. We reiterated the waiver in an affidavit when we challenged the denial of pension benefits here. The one person who won't be reinstated, if that matters and it doesn't, is my client. The rest of the world is iffy. It's iffy. I mean, the plan contemplates people being terminated and then being rehired for any reason. We don't even need a lawsuit if that wasn't the intent of the plan. Those provisions that I quoted specifically requiring the payment of benefits, the payment of benefits upon termination wouldn't be there, nor would all the other provisions that talk about a protocol for retiring for being terminated and then being rehired. They want to rely on this language about retirement because they want to segue into the IRS reg. The IRS reg, again, I'll reiterate, is very clear. It only talks about a penalty a plan can suffer if it pays out benefits to a before he's actually retired. And they admit as much in their papers. On page 19 in their opening brief, they say that there's no law to support their interpretation about any penalty for terminating an employee under IRS regulation. That's what they admit. They also say in their papers, gee, they reference there are some provisions that support our interpretation of termination. They quote the appellate record A145, A170. Guess what's there? Their denial letter to my client and then their brief in the underlying case. There's nothing. There's nothing in a 100-page plan that supports this bizarre interpretation. Can you imagine the chilling effect that such a ruling would have? Nobody's ever terminated. Gee, I'm going to sue my for discrimination. Well, motion to dismiss. You weren't terminated. If this court holds that termination means a reasonable prospect of reemployment, the law would be turned upside down. There would never be a plaintiff who could sue. Every one of those lawsuits would be subject to a motion to dismiss. You weren't terminated. We have a Second Circuit ruling. We have to wait and see what happens in the future. God only knows. The world's a crazy place. Anything can happen. Every lawsuit would die in its tracks. It's an absurdity, a total absurdity. Lastly, they mention a couple of cases. Soto, for example, Soto case was entirely different. That was about whether the term involuntary termination applies to somebody who is fired for disability. What the court held in Soto was this. You could look at involuntary termination for disability in two different ways. One way would be this. Well, I know it can't work, so I'm going to have to quit. Or you could look at it and say, well, it can't work, so you're fired. I mean, there's some ambiguity there in terms of the specific application of involuntary termination to disability. There is no term here that we're applying termination to. It is the term in and of itself. So that case has no bearing on this case. Nor does any other case they cite. They cite the O'Neill case, which similarly talked about whether the term earnings in the defined compensation plan was ambiguous. That's because there were 10 different qualifiers in the plan itself what So clearly it was difficult to construe what meant what. Here there is no ambiguity. Termination is termination. Nothing in the plan suggests otherwise. Everything in the plan talks about the procedures that happen after termination. You get your money. That has no bearing on being rehired. So unless the court has any further questions, I'm probably at my... Yes, you're actually past your limit, but it's okay. Thank you, Your Honor, for bearing with me for those additional moments. Thank you. So during the administrative process, Mr. Maurer contested the conclusion that there were reasonable prospects for him to return. During the administrative process, Mr. Maurer made the argument that there were no reasonable prospects for him to return. You've just heard here a lot of explanation as to why his attorney doesn't believe there are reasonable prospects for him returning. But that issue was not the issue that the district court took up. And in fact, it said specifically in a footnote at the there were reasonable prospects for Mr. Maurer returning because it concluded it didn't matter if there were any reasonable prospects for Mr. Maurer returning. This appeal is predicated on the challenge to the district court's conclusion that this plan unambiguously means that a referee gets his pension when he leaves, when he's terminated, regardless of whatever the prospects are of his returning. Even if he wrote a letter and said, I'm coming back tomorrow. Even if he filed a lawsuit saying, I want to come back to work, as Mr. Richardson, the other plaintiff, is doing right now. That's the issue that's in front of us. The issue that's not in front of us is whether in this particular case, Mr. Maurer had reasonable prospects of returning. If the court thinks that that issue should be revisited, we should go back to the district court to take up that issue. And we will defend that issue at an appropriate time. But that should not be what influences the decision over here. I would also point out that the various provisions of the plan that supposedly refer to terminated employees returning, we've covered this in our papers, but we've explained that in fact, most of those provisions don't refer to terminated employees at all. They refer to employees who return. They don't describe at all whether those people already got a pension and they certainly don't describe the circumstances under which they got a pension. So they don't resolve the ambiguity that we've identified here. I would also point out that in the Arasage case that my colleague mentioned, the plan very explicitly said that you become entitled to a pension if you cease to engage in covered employment. So they had an unanticipated situation. The head of the union continued to work, but not as a member of the union. So he wasn't engaged in covered employment. So he didn't retire in some colloquial sense of the word, but he did meet the very specific definition in the plan. But the committee engaged in a contextual reading of the plan that wasn't necessarily a hundred percent consistent with what the words of the plan said and didn't say. And the committee concluded using that contextual reading and also taking into account the risk from an IRS perspective of paying pension benefits to people who are still employed, that this was the better reading. That's precisely the type of thing we leave committees to do. And in the Soto case that my colleague mentioned that we talked about at some length, you could similarly say there was no qualifier on the word involuntary. It just says you get severance benefits if you've been involuntarily stopped working. And the point that the court made was that it was plausible to put a qualifier on that and construe involuntary to mean you were fired rather than you couldn't work because of a disability. It seemed like a harsh result. Judge Sullivan made a fairly impassioned dissent where he cited policy arguments, but I think the majority was correct in saying policy arguments is a reason why you might construe a plan one way versus another. But once you're talking about policy arguments, you're really not saying the plan is ambiguous. You're engaged in construction between competing meetings. And that's what the district court did here. And that's what we submit was inappropriate. Thank you. Thank you, Mr. Rumeld. So that's all we have on our argument calendar for today.